Okay, when you're ready. Thank you, Your Honor. Good morning. May it please the court. My name is Todd Thibodeau and with co-counsel Dan Benjamin, we represent the parents and the children of Kristen Maxwell Bruce. I am going to address the issues related to the summary judgment and Mr. Benjamin is going to address the post-trial issues. We're going to split our time six minutes, Mr. Benjamin will have five minutes, and we will reserve four minutes for rebuttal. Your Honors, Kristen Maxwell Bruce died of airway obstruction and blood loss. Her injuries were, according to the San Diego County Medical Examiner, her injuries were treatable, they were repairable, and they were survivable. According to the medical examiner, it took a minimum of one hour for Ms. Maxwell Bruce to die of her injuries. In the course of that hour, the defendant paramedics from the two agencies, the Alpine Fire Department and the VA House Fire Department, they failed to comply with four mandatory, at least four mandatory protocols, and these protocols that were in place at the time set the standard of care for the paramedics. The first thing they failed to do is they failed to contact a base hospital, and that was required. Your Honors, it was required by the protocol, specifically when, in this case, when a patient met trauma criteria, which the defendants immediately knew Kristen met the trauma criteria, they were required to contact a base hospital. If they were required to contact a base hospital. So the standard, as I understand it, of gross negligence is failure to provide even scant care or were in extreme departure from the ordinary standard of conduct. And the argument, as I understand it, is that failure to comply with your protocol maybe is negligence, maybe not, maybe not even below the standard of care, but they did provide more than scant care. Well, Your Honor. Can you address that? Yes, I can, Your Honor. Thank you. And the key that I would focus on is the or. Failure to provide scant care. Now, you may provide scant care. You may do something, but it still may be, and this is where the or comes in, it may be a extreme departure from the standard of care. And with regard to the standard of care, the failure to comply with the protocols is, by definition, a failure to comply with the standard of care, which is by definition... Is that true? I thought your own expert, Dr. Sackles, is that his name, said the acts were negligent or below the standard of care, but didn't say extreme departure from the ordinary standard of care. Did I misunderstand that? I don't think an expert is allowed to say it's gross negligence. He can say that, in his opinion, that it was below the standard of care. And the question of whether or not it's an extreme departure, whether the multiple failures to abide by the standard of care are an extreme departure, is generally a question for a jury. And in this case, the district court found that, as a matter of law, no reasonable jury could ever find that for deviation from four mandatory... What's your authority for... It's the behavior being characterized as gross negligence. The legal authority, Your Honor, the case authority would be the California Supreme Court, the Santa Barbara case, where the California Supreme Court said it's generally a question for the jury. I think also in the Chavez versus 24 hour fitness case, that was a case that actually reversed a grant of summary judgment on the issue of gross negligence. Those cases apply the standard that want of scant care, of even scant care, which is what the district court focused on, or an extreme departure from the standard of care. And here, we have the four protocols that weren't complied with. What says that the protocols define the standard of care? So in other words, I suppose the county could adopt a very high level of requirements, which would not necessarily be the standard of care, which is a much more general requirement. So what says that that's the standard of care? The VA house defendant's expert, Dr. Dunford, testified that the EMS protocols in place at the time set the standard of care for the paramedics here. So there's no question about that, that that is the standard of care. So they failed to contact the base hospital when they were required to. Another reason why they should have contacted the base hospital is when they're faced with a situation where they need some answers. And again, Dr. Dunford said, this is a situation beyond their control. And that should have caused them to contact the base hospital. Are you relying on the outcome of the interlocutory appeal to define the level of care that was required? No, Your Honor. I think the interlocutory appeal dealt solely with the sheriff defendants and not with... It also dealt with the sovereign immunity issue for the VA house fire department and the two VA house employees, but it didn't deal really with the standard of care. That was the custody issue, right? That was the issue with Mr. Maxwell being pepper sprayed and that, right. Yes. Okay. Thank you. I understand. Okay. And then in addition to failing to contact the base hospital, there was a failure to maintain a patent airway. I mean, it was mandatory in the protocols that her airway protected. And instead, she was laid flat on her back, she was duct taped to a backboard, and she was never released, even as, in the words of the defendants, even as she was struggling to breathe, she was grabbing at her collar, blood, according to them, blood was pouring from her mouth, they never untaped her or sat her up. There is still to this day, an unexplained and really inexplicable delay in the ambulance departing from the Maxwell house. It didn't depart until 22 minutes after the transporting ambulance arrived. And again, Dr. Dunford, who is the VA house paramedics expert, he testified in his deposition and at trial that there's a 10 minute standard, that gunshot, the standard is that gunshot victims should be taken from the scene within 10 minutes. And in this case, it was 22 minutes. So there was an unexplained delay. As I understand it, the reason that this assessment is necessary, legally speaking, is because the paramedics are entitled to a statutory protection, so that they are only liable for gross negligence. So in order to make that decision, you have to look at the totality of their involvement with this particular situation, this particular plaintiff or so when you cite the departures from certain protocols and so forth, it's misleading if you don't evaluate them in the context of everything they did, because maybe they, I'm saying this for purposes of this question, so maybe they tripped up on some things. They didn't call the base hospital and so forth. But when you consider what they were doing and in the totality, isn't the district judge entitled to say, no reasonable jury could conclude that the totality of the facts could be viewed by a reasonable jury as gross negligence. And therefore, the paramedics are entitled to the protections of the statute. Well, when we say totality of the facts, we have to look at the totality of the four separate breaches of the protocols, the unexplained delay, the failure to sit her up and untaper. And I think under the gross negligence standard, the district court would have to look at those six issues and say, you're right, you're correct that the paramedics can't be held liable for just negligence. It has to be gross negligence. But in order to grant summary judgment, the district court would have to look at all six issues and say, there's no reasonable jury that could find that this constitutes gross negligence. And our position is that a reasonable jury could easily find that one or two of these violations constitutes gross negligence, could certainly find that violation of all six of these issues, six for the standards and the two other issues, the delay and the failure to untape. A reasonable jury certainly could find that either that constitutes an extreme departure from the standard of care, or it constitutes when you leave someone who's bleeding from her mouth and struggling to breathe and you leave her taped to a backboard flat on her back, grasping at her collar and you fail to do something. Well, it's true that there were no facts in controversy with respect to the summary judgment. There were facts in controversy, Your Honor. I think that the defendants dispute that any of these protocols were mandatory. They claim that, in fact, they made attempts to intubate when really the protocol says attempting to visualize the airway is not an attempt to intubate. But the defendants say, no, it counts as an attempt to intubate. And we did it. The protocols say you have to use this emergency rescue device when you can't visualize the airway. They have a device that they're trained to use, this combi tube. The defendants say, no, it was really contraindicated because there was a throat injury and there was no throat injury. So that's another dispute. So there were lots of disputed facts. In addition to the disputes, you know, about there were disputes as to what the protocols say, let alone whether or not they were it was sufficient that a jury could find that this constituted an extreme departure from the standard of care. And we think the district court erred. Okay, you've you've you wanted to use six minutes. You're well past that. Why don't we pretend that you just use six minutes? So if you'll put nine minutes on the clock, thank you. And your co council can now go ahead. Thank you. Thank you, Your Honor. Uh, I'm going to address the two issues concerning the activities of the two or the three county defendants who remain. Uh, Kanabi, Nisha and Jackson. Uh, and I want to start with the detention of Jim Maxwell. Obviously, we have a 2013 decision by this court on the fact that you cannot detain someone simply because they are witness to a crime. Jim Maxwell was wait. That's not what that decision. Are you talking about the interlocutory order? Yes, it said for a long period of time, and it put some other factual circumstances into it. It didn't say you can't detain somebody under those circumstances. You just mentioned it. Well, Your Honor, it at the point and the point in time that I'm going to ask that we're in the interlocutory order were different from the facts in as they evolved in this case. Yes and no. Your Honor, the actual facts I want to focus on are the treatment of Jim Maxwell, and that occurred a couple hours after the shooting. So the shooting was shortly before midnight. We have the shooting happen. Uh, we have the family in the house. They eventually brought out of the house. The grandfather and Ms Maxwell and the kids are placed into the motor home. Jim Maxwell has moved to the top of the driveway. All the couple hours after the shooting is when the events relevant to the detention separation occur, which is when we start with Sergeant Kenobi telling Jim Maxwell that Kristen has died. So we do know a couple hours had passed, and those facts haven't changed from the interlocutory appeal to trial. That timeline is the same. What then happens, though, and what I think is key when we look at the opinion and where we are today, what the court said was that any extensive separation detention was not constitutional. Uh, and the county on the interlocutory appeals tried to say, Well, it was a crime scene, right? And isn't that what there was evidence that trial that there was at least some testimony? Was that, um, that they needed to secure the crime scene? Yes, Your Honor. And at risk of reading a bit of trial transcript, there's multiple examples that show that that's actually not how the testimony was matter because right because we're now we're now looking at a motion for a new trial or judgment. It's a matter of what it does matter because the actual testimony when the court looks at those sites and looks at the complete transcript will show that the defendants actually conceded that this area there's the property and then there's the house. And what happens is the concession is made only physical evidence. The only actual crime scene. If you talk about preserving physical evidence is inside that house. And so, for example, Deputy Nisha, the person who actually committed the first use for simply by telling Jim to stop, he holds out his hand and so on. Uh, the question was, uh, there's a couple questions starting on page 16 88 continuing to talk with 16 89 of the excerpt of record. Uh, it says and further down your report, you said you didn't want him to enter the crime scene. Now again, this is the deputy's contemporaneous report. You're saying don't. I didn't want to enter the crime scene. Crime scene, of course, being the house. Jim Max was on the driveway. It's not it. And the deputy admits that that's the case. Uh, and then was there tape that sort of yellow tape about crime scene? And was the mobile home where the wife was included in that? Was there ambiguity in the testimony as to whether or not that was included within the taped area? There's an out of what they call the outer perimeter. They taped off the entire property at the top of the driveway. And that's what Deputy Nisha said. Well, I just sort of chose that point and strung up tape that the mobile home is on the driveway. But of course, it's separate from the house. And what he said was, uh, I think at that point, the crime scene in my head was knowing the items of evidence and location at the shooting occurred. Question the house answer. Correct. So when we're looking at the particular deputy who actually gave the order what we contend is the unlawful order to, uh, Jim Maxwell, the actual testimony at the house. When we look at Sergeant Kanavi, he's the main one who the defendants rely on to say, well, he thought it was the crime scene. They cite some of his earlier testimony claiming that was all the, uh, you know, everything was a crime scene, basically, even though shooting was in the house, the property was. But then there were questions. It starts on 1284 continuing to 1285, where he's reminded of what was actually in Deputy Nisha's report. And he says, and you see where Deputy Nisha says, James began to walk down the driveway, headed back towards the crime scene. I turned and asked Sergeant Kanavi what my parameters were with James. I was instructed to not allow him back to the house and prevent him from having contact with other witnesses, including his wife. Is that, does that refresh your recollection of what happened? Answer? Yes. Okay. So the actual instructions, once his recollection is refreshed as he was supposed to keep Jim out of the house where Jim wasn't trying to get in the house, he was trying to get to his wife and keep him separate from his wife. That's the same testimony, I guess. I'm just looking at my notes that Kanavi stated that, um, his legal basis for preventing him from speaking with his wife is that he had been removed from the crime scene and Kay was in a motor's home inside the crime scene area. So are you saying he recanted that testimony? I'm saying under cross examination, he admitted that his actual instructions to Kanavi were based on don't let him in the house and don't let him speak to Kay. And I would further state, Your Honor, that Jim was in that yellow tape too. It's undisputed that Jim was in that, that outer perimeter, whatever you want to call it, where Sergeant, uh, sorry, where Deputy Nisha had strung up that tape. They're all in the driveway. The driveway was not the crime scene. What they're trying to do is... He's already in the perimeter of the tape. They're in, yeah, he's in, it's undisputed. He was inside, Jim is inside. It's a question of where he's moving on that driveway. Is he kept alone from his wife or was he allowed to tell his wife that their daughter just died? And that is what, what causes this entire event. If that order turns out to be lawful, do you agree that the efforts to enforce it were not excessive? I mean, if the order was lawful, then was the force that was used to enforce, to give effect to the order? If the order was, was lawful, then Jim Maxwell would be expected to follow the order, yes. So we have to concede that. The force that was used was not lawful. If the order was lawful, it would not be, and I want to make one more point on this, and then I do want to turn quickly to the Supreme Court case that was cited that also has some relevance to how that analysis should occur, if we are correct that the order was unlawful. But yes, a person is expected to follow a lawful order. They're not obligated to follow an unlawful order, and that is... It wasn't quite my question, but I'll take it as an acceptance of what I said. Yeah, I did want to point out that Pellegrino, one of their experts, also Bumcroft, but I'll focus on Pellegrino, also conceded the fact that the crime scene was the house, and that what they were trying to do was keep witnesses separate. That's defendants on it, experts at ER 1519 to 1520. I did, because time is tight, I wanted to quickly mention County of L.A. v. Mendez, which is the case raised in the County's Notice of Supplemental Authority, and it did limit part of the analysis that we can do here. It's our position, of course, that there's a constitutional violation once the unlawful order is given. There's then the question of whether or not the force at some point became excessive to enforce that order. Up until the County of L.A. v. Mendez case, we could simply point to Billington and say you provoked the act. We can no longer say that, and we do concede that. However, I want to make sure the court was aware that on pages 9 to 10 of the slip opinion in the Supreme Court's decision, it does say you can still have proximate damages flowing from the original constitutional violation. So if we are correct that there was a constitutional violation when the order was given to Jim, then in fact we can still have proximate damages from any of the excessive force that would have to be analyzed on remand, obviously. Is the only basis for your claim that the order was unlawful, the fact that it violated the interlocutory order? Our basis is that the rationale at the time and shown in testimony is that they were trying to keep the two members of the family separate or had no other valid reason because it's not about the crime scene. The crime scene is the house. So your answer is no, you have other grounds besides the interlocutory order. Well, I think the interlocutory order demonstrates that what the original rationale they gave was unconstitutional and then they they attempted to put a new rationale in of the crime scene and my point would simply be that the record does not actually support them on the crime scene. If that makes sense, Your Honor? Not too much, so let me try it again. It's probably because I didn't ask it right. So I understood from the briefs that your basis for claiming that that order that was issued, that you challenged, was because it was violative of the interlocutory order that came from this court, a panel of this court. Yes, it's an unconstitutional separation of family members, consistent with that. So if there are factual distinctions between what the court actually decided on that interlocutory order and the situation that you are challenging about the order, then that interlocutory order wouldn't control, would it? If there were, and that's why I would encourage the court, given the limited time here, to look at the excerpt of record sites from both sides very carefully and see what was actually established about where the crime scene was. And I think it's quite clear that the crime scene, the true crime scene, was in the house. Jim Maxwell was trying to see his wife and that's why it's a constitutional violation because they tried to stop him from seeing his wife outside the crime scene. This is not about crime scene management. It's a constitutional right to see your wife. I need to advance that one a little further in a law review article or something. Yeah, there's a constitutional due process right and it's reflected in the 2013 opinion to keep family members to be able to see each other, talk to each other, and communicate. And that is interfered with when the government says you can't go tell your wife that your daughter has died. And I do believe, Your Honor, that is established by the 2013 opinion as well as the authorities we cited in leading up to that 2013 opinion. Obviously, there's not space to miss my joke. Sorry. Sorry, Your Honor. Sometimes we take things too seriously. But we do have... Okay, well, you've taken us well past 15 minutes, but we will give you time for rebuttal. Before you begin, I need to talk to my law clerk about one thing unrelated to the case. Excuse me. Sorry for the interruption. It was unrelated to the case in front of us. Thank you, Your Honor. When you're ready. Good morning, Your Honor. Morris Hill on behalf of most of the sheriff's officers, but principally Officers Kanabi and Nesha. And are you going to split argument among yourselves? I'm going to try to keep mine down to four minutes, then Jackson will take a minute, and then the rest will belong to the medical people. Okay. As I said, there's no right to use any force on Jim Maxwell because the order to not enter the crime scene or the order to stop was an unlawful order. Yesterday, I didn't have a chance to write a letter to bring the court's attention to this, but yesterday there was a decision by another panel of this court, Schaefer versus Santa Barbara County, which dealt with virtually the identical issue in which a plaintiff, who had, his argument was, well, I didn't violate 148, Penal Code 148, because, and therefore they had no right to use force on me. And in that case, the jury had found excessive force and the panel reversed the excessive force verdict, in that case on grounds of qualified immunity, because of lack of Now, in this case, the plaintiffs contend that it was an unlawful order and they relied largely upon a statement in the interlocutory opinion that Penal Code Section 148 does not make it a crime, however, to resist unlawful orders. That is supposedly based on California law and it misstates California law. If you look at that statement and you look at the site for it and you trace it all the way back, that's just not what California law provides. Where that comes from is a case years ago, a criminal case, in which the issue was, is an officer discharging his correct duty when he uses excessive force and can you be convicted of 148 if the officer, if you're resisting excessive force by the officer? And that's really a different question than saying California law, the implication is California law makes it proper to resist what you consider to be an unlawful order. California law is just the opposite. You do not have a self-help remedy under California law to resist what you consider to be an unlawful order. Now that statement... Not so much what Mr. Maxwell considered it to be, the question is, was it in fact unlawful? Right. And the order was to keep him from the crime scene, the inner perimeter of the crime scene, the most restricted part of the crime scene. That's where he was going into. Well he was not going into the house, which I think is the most restricted, he was headed for the mobile home where his wife was. You could make an argument that the most restricted spot is the room in which the shooting took place. Right, but he was not headed there, nor was he headed to the house. Right, but he was within, the bright line here is the yellow tape across the He was already there, he was already within there. Well he had been brought out from there and then he went back into there. He had been brought back up to the street, which technically was part of the outer perimeter of the crime scene. It was also marked off with yellow tape, but the inner perimeter is what they were most trying to protect. And the reason they were trying to protect or keep Mr. Maxwell out was because of his emotional state. At that time he had just pushed a He was angry. He was associating the shooting with the officers there, and sort of forgetting that it was his son-in-law who shot his daughter. So it was his emotional state that made it imperative to... His son-in-law who was a police officer. I'm sorry? His son-in-law who was a police officer. His son-in-law was a corrections deputy. He was a corrections, a jailer. Law enforcement. Yeah, law enforcement. And so Mr. Maxwell was associating the uniform and he was you gave her the gun, meaning the sheriff's department, because he killed his daughter. He killed his daughter with the sheriff's department gun. So that's what the immediate impetus was to keep Mr. Maxwell out of the crime scene. And then he compounds that by going in there, by going down the driveway, the long driveway, and then he's grabbing Deputy Neshaw by the forearm. And then he's saying, you're about to get your ass kicked. And then he's saying, you're going to have to shoot me, actually. He said, you're going to have to shoot me first. But it was not a calm situation. And the thing that distinguishes cases like the Headwaters case that had to do with can you use force on somebody who isn't otherwise acting out, is that in Headwaters, the people on whom force was used were not acting out in any way. They were nonviolent, passive protesters. They weren't doing anything to any officers. In this case, we have a man who's already used force against two deputies by the time he gets pepper sprayed. And again, the purpose is to keep him out of the most restricted area, just to keep that orderly. Whether he would have done anything, we don't know. But up until that time, the plaintiffs are correct, up until that time, Mr. Maxwell had been inside the inner perimeter. But he had been under supervision the whole time. All of the family members were under supervision while they were in the inner perimeter. And they all did what they were asked to do the whole time, and nobody created a problem the whole time, except with Mr. Maxwell. And I don't mean this as a criticism of Mr. Maxwell, because it was understandable that he was upset. But when he started to act out, the deputy in charge, the sergeant in charge, decided that he needed to be excluded until he calmed down. And this was evidence that was presented at trial to the jury? Yes. The jury resolved, presumably. The jury saw photographs of the crime scene tape. They saw photographs of where Maxwell's RV was at the bottom of the driveway. It was well documented with photographs. And I see I'm well over my time. I don't want to dig into my opponent's time. Thank you. Good morning. Joe Catella, I represent Deputy Sheriff Jeffrey Jackson. In the one minute that I have, I just want to point out that the party with the burden of proving that Jackson prevented the medics from leaving the scene when they were together on scene for a total of 21 minutes, lays with the plaintiff. The plaintiff did not convince the jury. This disputed factual issue was submitted to the jury and determined adversely to the party with the burden of proof. At this stage in the proceeding, that finding, that conclusion, and the district court's assessment of that verdict is given great deference. After four weeks of evidence, the Maxwell's produced no direct evidence of delay. As the standing opinion noted in the interlocutory appeal, the only evidence at that stage was that Jackson's statement at a debrief that the sergeant, Canabi, was so concerned about something that he wouldn't allow, that he did not want the ambulance to leave. Well, there was no evidence that he wanted to leave and that's exactly what happened at trial. There was never any evidence except Jackson's statement at the debriefing on this issue of delay. Unless the court has any questions on that particular issue, I ask the court to affirm the judgment on behalf of Deputy Jackson. Okay, thank you. Good afternoon, Your Honor. Phillip Samoris on behalf of the defendants, Obbie and Felber. They are the VA Haas paramedics. Okay, and are you going to be the last one to speak or is there somebody else? There is one more for the Alpine paramedics. There were two. How much time are you going to take? I will take five minutes. I'm going to hold you to it. Fair enough. It bears emphasizing and repeating, of course, the standard here. Qualified immunity exists for my clients, Mr. Obbie and Felber, under the health and safety code sections. They are immune unless they act in a grossly negligent manner or not in good faith. Good faith is not even an issue here, so it's really focusing on gross negligence. You know, it seems pretty unfortunate, maybe even inept. As I understand the sequence of events, she is choking. She can't breathe. And before she's strapped down on several occasions, it's clear that she's having trouble breathing and she needs to sit back up. And they do that. And then they put her down on the board and she dies. That doesn't make any sense to me that they should have done that when it was clear that she was having breathing problems and that the breathing problems were ameliorated when she sat back up. Well, I don't see the record that way. Of the six paramedics who testified, they are consistent in stating that she tolerated the backboard well and didn't start experiencing breathing difficulties until she reached the back of the ambulance many, many minutes later. And it was at that point that the six emergency medical technicians, one was a driver, there was, I think, four holding the backboard, were tilting her to the side to drain blood, and that's when my client, Mr. Avi, attempted to intubate. In fact, when the plaintiffs make it appear as though they were ignorant or not cognizant of the airway issue, the record is clear that that is not the case. In fact, Mr. Avi testified that when he originally arrived at the scene, he saw and received the information and looked at the wound, and there was an airway issue. And he immediately went back to his ambulance and set up the laryngoscope, knowing that he might need it. Very clear. I agree with you. They understood the airway issue and they didn't resolve it very well. Well, sometimes things happen, and you can't blame. Certainly the gunshot wound to the neck and throat area and head area is the cause of death. In fact, their own expert testified to that. Dr. Sakles testified at deposition, and this is at page 2708 of the record, questioned, do you believe that the actual gunshot wound itself was the cause of Kristen's death? Answer, yes. The gunshot wound caused her death. And I'll also add that they quote the city of Santa Barbara case. That was a case in which the California Supreme Court held that prospective waivers of gross negligence would not be honored. They were against public policy. And the defendant in that case, supported by Amicus, argued, wait a second, if you don't allow us to enforce these prospective waivers of gross negligence, we're just going to be thrown into this standard of gross negligence and we'll never get summary judgment granted. It'll just be we're off to trial in all these cases. And the California Supreme Court wanted to emphasize, and I quote, we emphasize the importance of maintaining a distinction between ordinary and gross negligence and of granting summary judgment on the basis of that distinction in appropriate circumstances. Here, there were no, despite counsel's repeated assertions, there were no violations of protocol. None. In fact, there was a small army of paramedics attempting to help this woman, four from Alpine and two from Viejas. If this isn't a case, and they were providing attentive care, even their own expert, Dr. Sakles, admits that they were attempting to save this woman. Repeatedly. If this isn't a case for summary judgment, what is? She shot in the head and neck. That's an obvious risk of spinal injury. Dr. Sakles, again, their own expert, states in his report at page 2046, quote, patients with penetrating trauma to the head and neck are at obvious risk for a spinal cord injury. Close quote. And as a result, and he reaffirmed that at his deposition, that given her injury, she was an obvious risk for spinal injury. Under the policy, P104, that's at page 2085 of the record, there's a standing order to provide immobilization of the neck. That's the protocol. They follow the protocol. It becomes optional only if five conditions are present and documented. One of those conditions is there's no competing pain. Here, the poor lady had a shot-out jaw and teeth shattered. Clearly, there's competing pain. Because that factor is there, they have to follow the protocol of immobilizing the spine. They don't get to choose. This is the protocol. So they did not fall below the standard of care on that one. The attempt to intubate, again, these paramedics were aware of it. They had the laryngoscope ready. They twice attempted, Mr. Avi twice attempted, got out the laryngoscope, opened the mouth, put it in, and was unable to visualize the vocal cords. Their own expert, Dr. Sakles, admitted that visualizing the airway under this condition is, quote, difficult or impossible. Why didn't they call the base hospital? Well, that's a good question, Your Honor. According to the protocol, you contact the base hospital when you have a question regarding care. A question regarding care. And as Judge Houston stated in his ruling on the motion for summary judgment at page 11, lines 10 through 12, quote, there is no evidence indicating that the responders differed in their views concerning the proper standard of care being administered, such that contact with the base hospital might be required, close quote. That's what it was. All six of these people knew what to do. Get her on a backboard. Get her to the back of the ambulance. Try to intubate if you can. You can't visualize, which is, according to their own expert, difficult or impossible. Speed her off. And then this complaint about the combi tube, the blind device, that one clearly is counterindicated because of the injury to the esophagus and the neck area. If you attempt to use a combi tube in that situation, it is worse than ineffective. You can damage the neck area and thus preclude later surgical tracheotomy, thereby eliminating her best and only hope of being, of surviving. So they're following the protocol. Again, the protocol. I think we have the point. There's someone over there who's looking at you. Thank you, Your Honor. Drumming her fingers on the table. And how much time were you originally intended to get? I was originally intended four minutes, but I think I can speed through it even quicker than that. You've got four, but if you can talk faster than that, that would be fine. Vanjie Johnson for Alpine Fire District. I represent Captain Boglin, Paramedic Ross, Engineer Howell, and Fireman Meade. Our fire truck, Engine 17, is exactly that. It's a fire truck. It's not a transport vehicle. That's Protocol 805. This is a square peg round hole case, and I don't mean that to sound disrespectful at all. It's certainly a tragedy. But this is not one of those cases of gross negligence. There's no want of even scant care or extreme departure from the standard of care, which is clearly required under the Eastburn case. We've talked now about the City of Santa Barbara case, and there's some pretty excitable language in that case I'd like to quote. It says, Intentionally performing an act so unreasonable and dangerous that one knows it's highly probable it will result in harm. That's not what happened here. Alpine Fire responded at 1059. Within three minutes, all of this occurred. A medical exam. She was oriented, conscious, oriented, and responsive. Pressure to the neck and face was applied. Her blood pressure was taken. Her oxygen saturation was taken. Her respiratory was taken. Her pulse was taken. Blood was suctioned from her mouth. Teeth were suctioned from her mouth. They undertook C-spine precautions in direct compliance with the protocol. They stabilized her head. They put a C-spine collar on her. They identified her as a trauma patient, and they radioed for transport to a trauma unit. She was stable up until the point she got to Medic 25, the back of Medic 25. And at the back of Medic 25, what happened was she was tipped so that the blood could drain, and she was immediately intubated. There were attempts to intubate her right away. From the point that attempts were made to intubate her, CPR was started, and she was suctioned repeatedly. From the point she left the premise to the point she got to the airway, CPR continued, suctioning continued, and there was a second attempt at an intubation. This is not gross negligence. These emergency responders are entitled to qualified immunity. This is the appropriate case for a motion for summary judgment. Lastly, Your Honors, I want to just run through their own experts' testimony. Dr. Sickles, at 9 ER 2418, says, quote, these emergency personnel were trying to provide care to this patient, end quote. That meets the standard. He also says this was a prompt, appropriate initial and secondary examination and care protocol, including quick response times, immediately taking of the vitals, monitoring the EKG, respiration, pulse, and oxygen levels, and also slowing the bleeding and calling for mercy air. That's 9 ER 2400 through 2406. He also concedes that the C-spine precautions were appropriate, although he calls them conservative, but he doesn't say it was a breach in the standard of care. And a breach in the standard of care, Your Honors, is not the standard here. It's gross negligence, not a breach. But he doesn't even say breach. And lastly, excuse me, that was 9 ER 2403 through 2404. And lastly, Your Honors, what their expert says, what Dr. Skakel says, what he doesn't say is very telling. Not in one instance is there any testimony that any of these emergency personnel acted with gross negligence. There's nowhere in his testimony that that appears. Okay. Thank you. Thank you. You had sought to preserve four minutes. Let's put four minutes on the clock. Thank you, Your Honor. Very briefly, Your Honor, it's a disputed issue, as the Court alluded to, whether or not Kristen tolerated being laid on the backboard while all of the paramedics said she never sat up when they laid her down. All of the deputies testified to the opposite, as did her father. They said that every time they laid her down, she couldn't breathe, they had to sit her up. So there's a disputed issue of fact about whether or not she tolerated it well. We know that when she was in the back of the ambulance, according to the paramedics, she was grasping at her collar, trying to get out of it. So that's a disputed issue of fact. Second, Dr. Kampmann and Dr. Sackles both testified that while the gunshot wound, the gunshot was the mechanism of injury, the cause of death was obstructed airway. That's what Dr. Sackles says. This is his opinion at 8 ER 2043 through 2045. And Dr. Kampmann said it was a combination of, the cause of death was a combination of obstructed airway and blood loss. Dr. Sackles said, and I'm quoting, he said, there were several deviations from the standard of care that contributed to the death of the decedent, and he listed them at 8 ER 2045 and 2046. With respect to the so-called throat or esophageal injury, both doctors said in the autopsy shows there was no throat injury. Dr. Sackles said, while that's a concern when you have a gunshot wound to the jaw, it should have been clear to anybody looking at her that there was no esophageal injury. And moreover, you don't place emphasis over some potential injury to the esophagus when she can't breathe. You have to use, you have to open the airway because you're going to die immediately from that, and you're not going to place emphasis over some potential non-existent injury over being able to breathe. The last issue with regard to the protocols, the Viejas defendants didn't quote a single protocol in their brief. They didn't cite a single protocol in their brief. They didn't even acknowledge that the protocols provide the standard of care. The protocol for contacting the base hospital at 8 ER 20, I believe it's 2014, clearly says that you have to contact the base hospital, not just when you had questions, but when you have a trauma patient, which she was, when you're going to provide emergency advanced life-saving skills, which they did, and when you're going to transport an emergency patient, which they obviously were. So there were multiple deviations from the standard of care. A reasonable jury could find that these multiple deviations were gross negligence, and we believe the district court erred when it granted summary judgment to the defendants. Thank you. Okay, thank you. I'll be very brief because I have to be. When counsel for Mr. Hill was talking, he was talking, what he likes to do is he discusses this case. He kind of jumps to when there's already a confrontation between the deputy and Mr. Maxwell. The point here, Your Honors, is that the second he gives an unlawful order, the second he restricts Mr. Maxwell from seeing his wife, there's a constitutional violation. Again, on remand, there would then be a potential for whether or not any further altercation was a constitutional violation or damages flowing from that. There's a constitutional violation when you keep a man from telling his wife of the death of their child. There was also a statement made about crossing the tape or the like. It was very clear from the record that Mr. Maxwell was within the tape. He was on the driveway. The tape was at the top of the driveway. He was within the tape. There was no tape to cross between him and his wife. All he was doing was trying to see his wife. Thank you. May I ask one? Please, please. It's a collateral question. Was Mr. Bruce prosecuted? Yes, and his original plea bargain worked out by the county was rejected by one court. They disqualified that judge, and a new judge accepted the plea bargain. Thank you. Thank you. Thank both sides. As we're all aware, both sides, counsel and the bench, this is an agonizing case, and we're very sorry for what occurred. Maxwell v. County of San Diego submitted for decision. Thank you, and we're in adjournment for the day. All rise.
judges: W. Fletcher, Ikuta, Barker